# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1743

_____

| | | |
|---|---|---|
| Warner Bros. Entertainment, Inc.; | * | |
| Warner Bros. Consumer Products, | * | |
| Inc.; Turner Entertainment Co., | * | |
| | * | |
| Appellees, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| X One X Productions, doing | * | Eastern District of Missouri. |
| business as X One X Movie | * | |
| Archives, Inc.; A.V.E.L.A., Inc., | * | |
| doing business as Art & Vintage | * | |
| Entertainment Licensing Agency; | * | |
| Art-Nostalgia.com, Inc.; Leo | * | |
| Valencia, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: February 24, 2011
Filed: July 5, 2011

_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A.V.E.L.A., Inc., X One X Productions, and Art-Nostalgia.com, Inc. (collectively, "AVELA") appeal a permanent injunction prohibiting them from licensing certain images extracted from publicity materials for the films *Gone with the Wind* and *The Wizard of Oz*, as well as several animated short films featuring the cat-and-mouse duo "Tom & Jerry."  The district court issued the permanent injunction after granting summary judgment in favor of Warner Bros. Entertainment, Inc., Warner Bros. Consumer Products, Inc., and Turner Entertainment Co. (collectively, "Warner Bros.") on their claim that the extracted images infringe copyrights for the films.  For the reasons discussed below, we affirm in part, reverse in part, and remand for appropriate modification of the permanent injunction.

## I.    BACKGROUND

Warner Bros. asserts ownership of registered copyrights to the 1939 Metro-Goldwyn-Mayer ("MGM") films *The Wizard of Oz* and *Gone with the Wind*.  Before the films were completed and copyrighted, publicity materials featuring images of the actors in costume posed on the film sets were distributed to theaters and published in newspapers and magazines.  The images in these publicity materials were not drawn from the film footage that was used in the films; rather, they were created independently by still photographers and artists before or during production of the films.  The publicity materials, such as movie posters, lobby cards, still photographs, and press books, were distributed by the original rights-holder, MGM's parent company Loew's, Inc.,[1] and did not comply with the copyright notice requirements of the 1909 Copyright Act, 17 U.S.C. §§ 1 *et seq.* (1976) (superseded effective 1978). Warner Bros. also asserts ownership of registered  copyrights to various animated

_____

[1]Loew's obtained an interest in the copyright to *Gone with the Wind*, as well as the right to distribute the film, from producer David O. Selznick.

-2-

Tom & Jerry short films that debuted between 1940 and 1957.  Movie posters and lobby cards for these short films also were distributed without the requisite copyright notice.  As a result, Warner Bros. concedes that it has no registered federal copyrights in the publicity materials themselves.[2]

AVELA has acquired restored versions of the movie posters and lobby cards for *The Wizard of Oz*, *Gone with the Wind*, and several Tom & Jerry short films. From these publicity materials, AVELA has extracted the images of famous characters from the films, including Dorothy, Tin Man, Cowardly Lion, and Scarecrow from *The Wizard of Oz*; Scarlett O'Hara and Rhett Butler from *Gone with the Wind*; and the eponymous Tom and Jerry.  AVELA licenses the extracted images for use on items such as shirts, lunch boxes, music box lids, and playing cards, and as models for three-dimensional figurines such as statuettes, busts, figurines inside water globes, and action figures.  In many cases, AVELA has modified the images, such as by adding a character's signature phrase from the movie to an image modeled on that character's publicity photograph.  In other cases, AVELA has combined images extracted from different items of publicity material into a single product.  In one example, a publicity photograph of Dorothy posed with Scarecrow serves as the model for a statuette and another publicity photograph of the "yellow brick road" serves as the model for the base of that same statuette.

Warner Bros. sued AVELA, claiming that such use of the extracted images infringes the copyrights for the films.  Warner Bros. also asserted claims of, *inter alia*, trademark infringement and unfair competition.   AVELA contended that the distribution of the publicity materials without copyright notice had injected them into the public domain, thus precluding any restrictions on their use.  On cross-motions for summary judgment, the district court granted summary judgment to Warner Bros. on

---

[2]Some of the still photographs for *The Wizard of Oz* and a few of the movie posters for the Tom & Jerry films complied with copyright notice provisions, but those copyrights were not timely renewed.

the copyright infringement claim and denied summary judgment to both parties on the trademark infringement and unfair competition claims.

The district court's analysis  did not require it to determine expressly whether the publicity materials had reached the public domain.  Instead, the district court held that, even if the images were extracted from public domain materials, AVELA's practice of modifying the extracted images for placement on retail products constituted infringement of the film copyrights.  Warner Bros. averred that it would not assert the copyrights against unaltered reproductions of individual items of publicity material, eliminating any need to resolve whether the publicity materials were in the public domain.

Based on the finding of copyright infringement, the district court separately entered a permanent injunction against all use of the publicity material images, except for exact duplication of individual items of publicity material.  AVELA appeals the entry of the permanent injunction.

## II.    DISCUSSION

Although certain claims remain pending in the district court, we have jurisdiction over this appeal of the entry of a permanent injunction under 28 U.S.C. § 1292(a)(1).  Because the propriety of the permanent injunction depends upon the propriety of the underlying grant of summary judgment on the copyright infringement claim, we have jurisdiction to review the decision granting summary judgment as well. *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 (8th Cir. 2004).  We review a grant of summary judgment *de novo*, affirming only if "the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir. 2002).  We may affirm the judgment of the district court "on any basis disclosed in the record, whether

-4-

or not the district court agreed with or even addressed that ground." *PFS Distribution Co. v. Raduechel*, 574 F.3d 580, 591 (8th Cir. 2009) (quoting *Palavra v. I.N.S.*, 287 F.3d 690, 693 (8th Cir. 2002)).

## A.    Copyright Ownership

The plaintiff in a copyright infringement claim has the burden to prove ownership of a valid copyright. *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 962 (8th Cir. 2005). In support of its motion for summary judgment, Warner Bros. submitted an affidavit from Kate Chilton, its in-house counsel, tracing the interaction of the various assignment and corporate merger documents that establish Warner Bros.'s chain of title to the asserted copyrights back to 1939. The affidavit stated that Chilton had personal knowledge of the facts recited, based on her review of corporate documents. However, while the affidavit stated that the referenced documents had been produced to AVELA in discovery, the actual documents establishing chain of title were not attached to the affidavit.

AVELA argues that the district court erred in considering the affidavit and that, absent the challenged affidavit, Warner Bros. did not submit evidence sufficient to prove ownership of the copyrights. In particular, AVELA contends that the documents establishing title were not in the record and that Chilton was not competent to testify about chain of title because her review of the documents did not give her "personal knowledge," as required by Fed. R. Civ. P. 56. The version of Rule 56 in effect at the time of the summary judgment motion stated:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

Fed. R. Civ. P. 56(e)(1) (2010) (superseded Dec. 1, 2010). We review the admission of evidence for consideration at the summary judgment stage for an abuse of discretion. *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 907 (8th Cir. 2010).

While Warner Bros.'s failure to attach the referenced documents to the affidavit was error under the version of Rule 56 in effect at the time, the error was harmless. *See Sugarbaker v. SSM Health Care*, 190 F.3d 905, 911 (8th Cir. 1999). There is no dispute that the referenced documents were produced to AVELA in discovery. In addition, they were in the record because they were attached to Warner Bros.'s original complaint.[3] Despite having had a full opportunity to review the documents establishing chain of title to the copyrights, AVELA points to no inadequacies in the chain-of-title documents themselves. Because the documents would be admissible at trial, the error in form at the summary judgment stage was harmless in this case.[4] *Cf. Walker v. Wayne Cnty., Iowa*, 850 F.2d 433, 435 (8th Cir. 1988) (finding no reversible error in the district court's consideration of inadmissible hearsay at the summary

---

[3]Although a Second Amended Complaint without the documents attached was operative at the time of the summary judgment motion, we have recognized that documents attached to a superseded original complaint are part of the record before the district court. *See, e.g.*, *Muhammed v. DEA, Asset Forfeiture Unit*, 92 F.3d 648, 654 (8th Cir. 1996) (holding that an exhibit attached to the plaintiffs' original complaint must be considered on a motion to dismiss, despite the fact that the plaintiffs' amended complaint did not include or cite the contents of that exhibit); *Less v. Lurie*, 789 F.2d 624, 625 (8th Cir. 1986) (considering a partnership agreement attached only to plaintiffs' initial complaint in considering a motion to dismiss plaintiffs' Second Amended Complaint).

[4]The current version of Rule 56 no longer requires attachment of a sworn or certified copy of each paper referenced in an affidavit. *See* Fed. R. Civ. P. 56(c)(4). Instead, a party that wishes to challenge an affiant's reliance on an unattached document may object that the material "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

-6-

judgment stage where the same evidence could be submitted in admissible form at a trial).

In addition, we reject the argument that Chilton was not competent to testify on the matters stated in the affidavit.  Chilton's affidavit simply explained how to navigate the array of documents showing that the asserted copyrights were valid and that Warner Bros. had obtained ownership of them. "A lay witness may give an opinion only if it is rationally based on the perception of the witness and would help the factfinder determine a matter in issue." *Hurst v. United States*, 882 F.2d 306, 312 (8th Cir. 1989).  Here, Chilton's opinion about how the multiple documents combined to establish chain of title could be viewed as helpful to the factfinder.  Furthermore, "[p]ersonal knowledge or perception acquired through review of records prepared in the ordinary course of business . . . is a sufficient foundation for lay opinion testimony." *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004-05 (8th Cir. 1986).  Therefore, Chilton's review of the documents was sufficient to render her competent to testify to the matters in the affidavit.

As a result, the district court did not abuse its discretion in admitting the affidavit.  AVELA makes no argument that the documents and affidavit, if admissible, are insufficient to establish chain of title.  Therefore, we proceed to determine whether AVELA's use of images from the publicity materials infringes the film copyrights.

### B.    The Public Domain Nature of the Publicity Materials

Because our analysis differs from that of the district court, we find it necessary to determine whether the publicity materials reached the public domain.

Whether a work entered the public domain prior to January 1, 1978, the effective date of the 1976 Copyright Act, 17 U.S.C. §§ 101 *et seq.*, must be determined according to copyright law as it existed before that date, under the 1909

-7-

Copyright Act.  *See Brown v. Tabb*, 714 F.2d 1088, 1090-91 (11th Cir. 1983).  Under the 1909 Copyright Act, one who created an artistic work held a common law copyright in that work until "publication" occurred.  *See Burke v. Nat'l Broad. Co., Inc.*, 598 F.2d 688, 691 & n.2 (1st Cir. 1979).  If the publication complied with the notice requirements of the 1909 Copyright Act, the common law copyright was replaced with a federal statutory copyright, but a publication without the prescribed notice resulted in the forfeiture of any copyright.  *Data Cash Sys., Inc. v. JS&A Grp., Inc.*, 628 F.2d 1038, 1042 (7th Cir.1980).  In other words, the general rule under the 1909 Copyright Act is that a work published in the United States without the statutorily required copyright notice fell into the public domain, "precluding forever any subsequent copyright protection of the published work."  *Twin Books Corp. v. Walt Disney Co.*, 83 F.3d 1162, 1165-66 (9th Cir. 1996).

Warner Bros. concedes that the publicity materials now copied by AVELA were distributed to theaters without the statutorily required notice, but it nevertheless contends that these materials were not injected into the public domain because their distribution was a "limited publication."   As distinguished from a "general publication" that results in injection into the public domain, a limited publication is one that occurs "under conditions which exclude the presumption that [the work] was intended to be dedicated to the public."  *Am. Tobacco Co. v. Werckmeister*, 207 U.S. 284, 299 (1907), *superseded by statute*, Copyright Act of 1976, *as recognized in Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985).  Courts developed the doctrine of limited publication "[t]o lessen the sometimes harsh effect of the rule that publication destroyed common law rights."  *Brown*, 714 F.2d at 1091.  Warner Bros. contends that the conditions for a limited publication were satisfied for the movie posters and lobby cards for *The Wizard of Oz* and *Gone with the Wind* because those materials were not distributed directly to the general public, but rather were leased solely to theaters under an agreement (the "National Screen Agreement")

-8-

that required the materials to be returned or destroyed after the theater stopped running the subject film.[5]

We have held that a publication is general, rather than limited, if the rights-holder demonstrated an express or implied intent to abandon his right to control distribution and reproduction of his work, as determined objectively from "the implications of his outward actions to the reasonable outsider." *Nucor Corp. v. Tenn. Forging Steel Serv., Inc.*, 476 F.2d 386, 390 n.7 (8th Cir. 1973) (quoting *Edgar H. Wood Assocs., Inc. v. Skene*, 197 N.E.2d 886, 892 (Mass. 1964)). There is a dearth of Eighth Circuit case law applying this test, and the parties argue this issue under a framework developed by the Ninth Circuit and adopted by several other circuits defining a limited publication as a distribution (1) to a definitely selected class of persons, (2) for a limited purpose, (3) without the right of reproduction, distribution, or sale. *See White v. Kimmell*, 193 F.2d 744, 746-47 (9th Cir.1952); *see also Brown*, 714 F.2d at 1091; *Data Cash Sys.*, 628 F.2d at 1042; *Burke*, 598 F.2d at 692; *Am. Visuals Corp. v. Holland*, 239 F.2d 740, 744 (2d Cir. 1956); 1-4 Melville B. & David Nimmer, *Nimmer on Copyright* § 4.13 (hereinafter "*Nimmer on Copyright*"). We agree that this test may help to focus the analysis.

Based on the record, any reasonable jury would have to conclude that the "return or destroy" provisions of the National Screen Agreement did not effectively preclude redistribution or sale of the images in the publicity materials made available to theaters for *The Wizard of Oz* and *Gone with the Wind*. For example, Leith Adams, Warner Bros.'s expert, conceded that theaters could "buy by the thousands" handouts

---

[5] Notably, the National Screen Agreement submitted into the record by Warner Bros. covered publicity materials for films produced between July 8, 1937 and December 31, 1939. Because the Tom & Jerry short films at issue here debuted between 1940 and 1957, and Warner Bros. asserts no later agreements or additional grounds for finding a "limited publication," Warner Bros. essentially concedes that the Tom & Jerry publicity materials are in the public domain.

-9-

and promotional flyers to pass out to the general public.  At least some of these handouts and flyers included images of the characters.  "Exploitation books" associated with *The Wizard of Oz* and *Gone with the Wind* allowed theaters to select promotional giveaway or sale items for the public, ranging from color-tinted publicity photographs to matchbooks to spare-tire covers.  No evidence suggests that theaters were expected to recover these items from the public and return or destroy them. Adams also conceded that in addition to movie posters and lobby cards for the theaters' own premises, theaters could obtain movie posters expressly constructed for posting on telephone poles throughout the theater's local area.  When asked if these movie posters generally were returned or destroyed, Adams responded, "I don't think so but I don't know."  We also note that Loew's initially took steps to obtain a federally registered copyright in some of the still photographs used in publicity materials for *The Wizard of Oz*, suggesting that Loew's did not expect the National Screen Agreement to preserve its copyrights in such materials.

As an additional matter, publicity material images for the films were distributed directly to the general public through newspapers and magazines.  As a leading treatise states:

> An issue of recurring application is publicity photos for motion pictures from the 1920's through 1970's.  The films themselves from that era were routinely protected as validly noticed and registered works; but much less care was typically exercised during production and in the publicity office.  Often, photos were taken on the set depicting the same stars, wearing the same costumes, appearing in the same scenery, that would later appear in the photoplay, but the photographs were sent off to newspapers before the film's release, in order to generate a buzz about its opening.

1-4 *Nimmer on Copyright* § 4.13[A][3].

-10-

Here, the record includes publicity photographs for *The Wizard of Oz* that appeared in *McCall's* magazine, *The Saturday Evening Post*, the *St. Louis Post-Dispatch*, and the *Chicago Herald and Examiner* before the film was released.  It also includes publicity photographs for *Gone with the Wind* that appeared in the *Atlanta Constitution* and the *Atlanta Journal*, and other published material indicating that *Gone with the Wind* publicity photographs appeared in several magazines in the United States before the film was released.  Obviously, in each case, the rights-holder granted the right of "reproduction, distribution [and] sale" of the subject publicity photographs to each respective newspaper and magazine.  *White*, 193 F.2d at 747.  At least one court has held that distribution of promotional photographs to theaters, even under an effective condition that the photographs be returned, is not sufficient to demonstrate a limited publication where the photographs are also distributed for use by newspapers and magazines.  *See Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*, 378 F. Supp. 2d 1189, 1198-99 (C.D. Cal. 2005), *aff'd*, 320 F. App'x 572 (9th Cir. 2009) (unpublished per curiam).[6]

---

[6]Warner Bros. argues that the distribution to newspapers and magazines is irrelevant in this case because AVELA extracts images only from restored movie posters and lobby cards, not from newspapers and magazines.  Experts for both parties agreed, however, that the materials provided to theaters, on the one hand, and the materials provided to newspapers and magazines, on the other, were drawn from a single, comprehensive set of publicity images created for the sole purpose of promoting each film.  Both avenues of distribution would be relevant to a reasonable outsider trying to discern Loew's intent to place limits on reproduction, distribution, and sale when it put these publicity materials in others' hands without copyright notice.  *See Nucor Corp.*, 476 F.2d at 390 n.7; *Milton H. Greene Archives*, 320 F. App'x at 573 (affirming, where publicity materials were distributed variously "to magazines, newspapers, and local theaters," that a general publication still occurred with respect to the pictures that "were not used [by the recipients] as broadly as the others or at all" because the materials were made available with no limits on diffusion, reproduction, or distribution).

-11-

Given the undisputed evidence regarding handouts, flyers, giveaway and sale items, and movie posters for telephone poles distributed under the National Screen Agreement (in apparent contravention of its "return or destroy" provisions), as well as the widespread distribution of many publicity images to newspapers and magazines, the only possible "implications of [Loew's] outward actions to the reasonable outsider" is that Loew's intended to abandon the right to control reproduction, distribution, and sale of the images in the publicity materials. *See Nucor Corp.*, 476 F.2d at 390 n.7.  In terms of the Ninth Circuit test, the publicity materials simply were not distributed to a definitely selected class of persons without the right of reproduction, distribution, or sale.  *See White*, 193 F.2d at 746-47.  To the contrary, the purpose of the distribution of all of these publicity materials was to reach as much of the public as possible.  The studio itself happily estimated at the time that over 90 million people would see the advertising campaign for *The Wizard of Oz*.  In practical terms, "courts have hesitated to find general publication if to do so would divest the common law right to profit from one's own work," *Burke*, 598 F.2d at 691, but here it appears Loew's viewed the publicity materials as a tool to maximize profit from the copyrighted films, not as an independent source of revenue.  Therefore, we conclude that the publicity materials for *The Wizard of Oz* and *Gone with the Wind*, as well as for the Tom & Jerry short films, are in the public domain.[7]

---

[7]Warner Bros. also argued in district court that the publicity materials are protected by the film copyrights as derivative works of the films.  Under the 1909 Copyright Act, what came to be known as "derivative works" were defined as "[c]ompilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works . . . ."  17 U.S.C. § 7 (repealed effective 1978); *see Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 591 (2d Cir. 1999).  Here, it is undisputed that the publicity materials were not based on film footage used in the copyrighted films, but rather on still photographs and artists' renderings created independently from the film footage.  Because they were not adapted or otherwise created from the films, the publicity materials cannot be "derivative works" of the films.

## C.   Copyright Infringement and the Right to Make Use of Public Domain Materials

The elements of copyright infringement are (1) ownership of a valid copyright and (2) copying of original elements of the copyrighted work. *Taylor*, 403 F.3d at 962-63. As discussed above, Warner Bros. has established ownership of valid copyrights in the movies and animated shorts. Copying can be shown either by (1) direct evidence of copying, or (2) access to the copyrighted material and substantial similarity between the AVELA work and the copyrighted work. *Id.* at 964. There is no dispute that AVELA had access to the films in question, each of which has a long history of popularity. *See, e.g.*, *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1297 (C.D. Cal. 1995) ("[T]he sheer worldwide popularity and distribution of the Bond films allows the Court to indulge a presumption of access."). In addition, there is no dispute that the images in the AVELA works are substantially similar to the images in the copyrighted films, as they are in fact images of the same people in the same costumes (or, in the case of Tom and Jerry, of the same cartoon characters). The only remaining question is whether AVELA has appropriated "original elements" of the films, *see Taylor*, 403 F.3d at 962-63, or solely elements that are in the public domain.

Warner Bros. does not challenge the products that are exact reproductions of an entire item of publicity material. Instead, Warner Bros. contends that AVELA has extracted images from the public domain materials and used them in new ways that infringe the copyrights in the associated films. AVELA admits that it has used the images in new ways (and indeed has applied for its own copyrights for such derivative works), but it counters that there is no limitation on the public's right to modify or make new works from public domain materials.

AVELA is correct that, as a general proposition, the public is not limited solely to making exact replicas of public domain materials, but rather is free to use public

-13-

domain materials in new ways (*i.e.*, to make derivative works by adding to and recombining elements of the public domain materials).  "[W]here a work has gone into the public domain, it *does* in fact follow that any individual is entitled to develop this work in new ways."  *Pannonia Farms, Inc. v. USA Cable*, 2004 WL 1276842, at *9 & n.20 (S.D.N.Y. June 8, 2004) (rejecting the theory that the plaintiff's copyrights in nine original Sherlock Holmes stories gave the plaintiff the exclusive right to make derivative works featuring the Holmes and Dr. Watson characters because fifty-plus earlier stories already had reached the public domain).  Nevertheless, this freedom to make new works based on public domain materials ends where the resulting derivative work comes into conflict with a valid copyright.

For example, in *Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989), a number of pre-1948 Amos 'n' Andy radio scripts had entered the public domain.  However, CBS held valid copyrights in a number of post-1948 radio scripts and, arguably, in a later television series.  In 1981, Silverman began developing a Broadway musical version of Amos 'n' Andy, and CBS alleged that his script infringed its copyrights.  Like AVELA here, Silverman argued that because the pre-1948 Amos 'n' Andy scripts were in the public domain, he was free to make any derivative work he wished featuring the Amos 'n' Andy characters.  The court disagreed, holding that derivative works based on the public domain scripts still would infringe to the extent they used "any further delineation of the characters contained in the post-1948 radio scripts and the television scripts and programs, if it is ultimately determined that these last items remain protected by valid copyrights."  *Id.* at 50; *see also Pannonia Farms*, 2004 WL 1276842, at *9 (noting that although the characters of Sherlock Holmes and Dr. Watson were in the public domain based on fifty-plus public domain original stories, a new work that incorporated "character traits newly introduced" by the nine later original stories still under copyright would infringe those copyrights).

In other words, if material related to certain characters is in the public domain, but later works covered by copyright add new aspects to those characters, a work

-14-

developed from the public domain material infringes the copyrights in the later works to the extent that it incorporates aspects of the characters developed solely in those later works.  Therefore, we must determine (1) the apparent scope of the copyrights in the later works (here, the films), (2) the scope of the material dedicated to the public in the publicity materials, which correspondingly limits the scope of the film copyrights, and (3) the scope into which each of AVELA's images falls.  If an AVELA work falls solely within the scope of the material dedicated to the public, there can be no infringement liability under the film copyrights.  On the other hand, if some portion of an AVELA work falls outside the scope of the material dedicated to the public, but within the scope of the film copyrights, AVELA is liable for infringement.

### 1.    The Scope of the Film Copyrights

It is clear that when cartoons or movies are copyrighted, a component of that copyright protection extends to the characters themselves, to the extent that such characters are sufficiently distinctive.  *See, e.g.*, *Gaiman v. McFarlane*, 360 F.3d 644, 661 (7th Cir. 2004) ("[A] stock character, once he was drawn and named and given speech [in a comic book series] . . . became sufficiently distinctive to be copyrightable."); *Olson v. Nat'l Broad. Co., Inc.*, 855 F.2d 1446, 1452 (9th Cir. 1988) (holding that "copyright protection may be afforded to characters visually depicted in a television series or in a movie" for "characters who are especially distinctive"); *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1296 (holding that plaintiffs' copyrighted James Bond films established a copyright in the character of James Bond).  The district court thoroughly and accurately applied this principle to the instant case, and the parties do not contest the district court's analysis.  We agree with the district court's conclusion that Dorothy, Tin Man, Cowardly Lion, and Scarecrow from *The Wizard of Oz*, Scarlett O'Hara and Rhett Butler from *Gone with the Wind*, and Tom and Jerry each exhibit "consistent, widely identifiable traits" in the films that are

-15-

sufficiently distinctive to merit character protection under the respective film copyrights.  *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003).

AVELA correctly points out that the scope of copyright protection for the characters in the films *The Wizard of Oz* and *Gone with the Wind* is limited to the increments of character expression in the films that go beyond the character expression in the books on which they were based.  *See Silverman*, 870 F.2d at 49 ("[C]opyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of the derivative works.").  While true, this has little practical effect in the instant case, as a book's description of a character generally anticipates very little of the expression of the character in film:

> The reason is the difference between literary and graphic expression. The description of a character in prose leaves much to the imagination, even when the description is detailed—as in Dashiell Hammett's description of Sam Spade's physical appearance in the first paragraph of The Maltese Falcon.  "Samuel Spade's jaw was long and bony, his chin a jutting v under the more flexible v of his mouth.  His nostrils curved back to make another, smaller, v.  His yellow-grey eyes were horizontal. The v motif was picked up again by thickish brows rising outward from twin creases above a hooked nose, and his pale brown hair grew down—from high flat temples—in a point on his forehead.  He looked rather pleasantly like a blond satan."  Even after all this, one hardly knows what Sam Spade looked like.  But everyone knows what Humphrey Bogart looked like.

*Gaiman*,  360 F.3d at 660-61.

The film actors' portrayals of the characters at issue here appear to rely upon elements of expression far beyond the dialogue and descriptions in the books. AVELA has identified no instance in which the distinctive mannerisms, facial expressions, voice, or speech patterns of a film character are anticipated in the corresponding  book by a literary description that evokes, to any significant extent,

-16-

what the actor portrayed.  Put more simply, there is no evidence that one would be able to visualize the distinctive details of, for example, Clark Gable's performance *before* watching the movie *Gone with the Wind*, even if one had read the book beforehand.  At the very least, the scope of the film copyrights covers all visual depictions of the film characters at issue, except for any aspects of the characters that were injected into the public domain by the publicity materials.

### 2.  *The Scope of the Material Dedicated to the Public*

AVELA contends that the injection of the publicity materials into the public domain simultaneously injected the film characters themselves into the public domain. To the extent that copyright-eligible aspects of a character are injected into the public domain, the character protection under the corresponding film copyrights must be limited accordingly.

As an initial matter, we reject AVELA's contention that the publicity materials placed the entirety of the film characters at issue into the public domain.  The isolated still *images* included in the publicity materials cannot anticipate the full range of distinctive speech, movement, demeanor, and other personality traits that combine to establish a copyrightable character. *See, e.g.*, *Gaiman*, 360 F.3d at 660 (holding that the character's "age, obviously phony title ('Count'), what he knows and says, [and] his name" combine with his visual appearance "to create a distinctive character"); *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1296 (citing "various character traits that are specific to Bond—i.e. his cold-bloodedness; his overt sexuality; his love of martinis 'shaken, not stirred;' his marksmanship; his 'license to kill' and use of guns; his physical strength; [and] his sophistication," rather than his visual appearance alone, as establishing the copyrightability of the character); *cf. Walker v. Viacom Int'l, Inc.*, 2008 WL 2050964, at *5-6 (N.D. Cal. May 13, 2008) (holding that a copyrighted cartoon consisting of "four small and largely uninformative black and white panels" that conveyed "little to no information about [the character's] personality or character

-17-

traits" was insufficient to establish copyright protection of the character). Nevertheless, the publicity materials could have placed some aspects of each character's visual appearance into the public domain.

A situation somewhat similar to the one we face was presented in *Siegel v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008). The defendants owned the copyright in two promotional announcements for Superman comics, published before the first Superman comic book was issued. The black-and-white promotional announcements each included an image of the protagonist "wearing some type of costume" and "holding aloft a car." *Id.* at 1126. The defendants argued that their copyright in the promotional announcements gave them rights over the entirety of the Superman character as later developed (and copyrighted separately) in the comic book. The court disagreed, stating:

> [N]othing concerning the Superman storyline (that is, the literary elements contained in Action Comics, Vol. 1) is on display in the ads; thus, Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed, or his heroic abilities in general, do not remain within defendants sole possession to exploit. *Instead the only copyrightable elements left [to defendants] arise from the pictorial illustration in the announcements, which is fairly limited.*

*Id.* (emphasis added). As a result, the scope of the promotional announcements encompassed only the limited character of "a person with extraordinary strength who wears a black and white leotard and cape." *Id.* Despite the earlier publication of the promotional announcements, the copyright in the later comic book nevertheless encompassed the fully developed character with "Superman's distinctive blue leotard (complete with its inverted triangular crest across the chest with a red "S" on a yellow background), a red cape and boots, and his superhuman ability to leap tall buildings, repel bullets, and run faster than a locomotive, none of which is apparent from the announcement." *Id.* Importantly, the scope of the character copyrighted through the promotional announcements was viewed on the strict basis of what was clearly visible

-18-

in the announcements, not through the additional perspective of the later, more developed work.

In the instant case, the only "copyrightable elements" in the publicity materials (albeit injected into the public domain, rather than registered for copyright) are even more limited than in *Siegel*. While the promotional announcements in *Siegel* at least showed proto-Superman holding a car over his head, establishing a distinguishing characteristic of "extraordinary strength," the publicity materials here reveal nothing of each film character's signature traits or mannerisms. At most, the publicity materials could have injected some of the purely visual characteristics of each film character into the public domain, akin to the character in "a black and white leotard and cape." *Id.*

Because we must rely solely on visual characteristics, the individuals shown in the publicity materials establish "characters" for copyright purposes only if they display "consistent, widely identifiable" visual characteristics. *See Rice*, 330 F.3d at 1175. The *Walker* case is instructive in this regard. There, the plaintiff asserted his copyright in a comic strip entitled "Mr. Bob Spongee, The Unemployed Sponge" against the producers of the animated television series "SpongeBob SquarePants." 2008 WL 2050964 at *1. The plaintiff had created sponge dolls based on his comic strip and placed advertisements in a newspaper. *Id.* Because these materials revealed "little to no information about Mr. Bob Spongee's personality or character traits," *id.* at *5, the court could look only to his visual appearance for distinctiveness. The court held that in such a situation, a consistent visual appearance throughout the materials was a prerequisite for character protection. *See id.* at *5-6. Because of variations in the sponge's clothing, color, eye and nose shape, and hair among the comic strip,

-19-

dolls, and advertisements, the plaintiff's copyright did not create *any* character protection. *Id.* at *6.[8]

Therefore, we must determine if any individual is depicted with consistent, distinctive visual characteristics throughout the various publicity materials. If so, those consistent visual characteristics define the "copyrightable elements" of that film character, *Siegel*, 542 F. Supp. 2d at 1126, which were injected into the public domain by the publicity materials. If not, then there are no visual aspects of the film character in the public domain, apart from the publicity material images themselves.

With respect to the cartoon characters Tom and Jerry, we note that on the spectrum of character copyrightability, the category of cartoon characters often is cited as the paradigm of distinctiveness. *See, e.g.*, *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983); 1-2 *Nimmer on Copyright* § 2.12. The record indicates that the Tom & Jerry publicity materials consist of just one public domain movie poster for each copyrighted short film, and the visual characteristics of Tom and Jerry in the first poster, for *Puss Gets the Boot* (released in 1940), are quite different from the characters popularly recognized as Tom and Jerry today. In addition, the first poster by itself reveals no distinctive character or visual traits, but only visual characteristics typical to cats and mice. As a result, the first poster is essentially a generic cat-and-mouse cartoon drawing that cannot establish independently copyrightable characters. *Cf. Walker*, 2008 WL 2050964 at *5-6

---

[8]Of course, the presence of distinctive qualities apart from visual appearance can diminish or even negate the need for consistent visual appearance. *See, e.g.*, *Metro-Goldwyn-Mayer*, 900 F. Supp. at 1296 (holding that variations in the visual appearance of James Bond did not negate character protection in light of his many distinctive and consistently displayed character traits; the fact that "many actors can play Bond is a testament to the fact that Bond is a unique character whose specific qualities remain constant despite the change in actors").

(finding a four-panel cartoon drawing featuring a personified sponge lacked the distinctiveness necessary to establish a copyrightable sponge character).

Meanwhile, the copyrighted short film that immediately followed the first poster revealed Tom and Jerry's character traits and signature antagonistic relationship. With the benefit of these strong character traits, the first short film *was* sufficient to establish the copyrightable elements of the Tom and Jerry characters as depicted therein. *See ante* at 15-16. In such a situation, each subsequent movie poster could inject into the public domain only the increments of expression, if any, that the movie poster itself added to the already-copyrighted characters from previously released Tom & Jerry films. *See Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1979) ("[A]lthough the derivative work may enter the public domain, the matter contained therein which derives from a work still covered by statutory copyright is not dedicated to the public."); 1-3 *Nimmer on Copyright* § 3.07. Because they "derive[] from a work still covered by statutory copyright," the underlying characters of Tom and Jerry are not in the public domain until the copyrights in the Tom & Jerry short films begin to expire.

In contrast to Tom & Jerry, the record is clear that a veritable blitz of publicity materials for *Gone with the Wind* and *The Wizard of Oz* was distributed prior to the publication of each film. However, with respect to *Gone with the Wind*, the publicity material images are far from the cartoon-character end of the spectrum of character copyrightability. There is nothing consistent and distinctive about the publicity material images of Vivian Leigh as Scarlett O'Hara and Clark Gable as Rhett Butler. They certainly lack any cartoonishly unique physical attributes, and neither one is shown in a consistent, unique outfit and hairstyle. *See Walker*, 2008 WL 2050964 at *6; *cf. Siegel*, 542 F. Supp. 2d at 1126 (finding "a black and white leotard and cape" sufficiently distinctive to establish an element of character copyrightability). As a result, the district court correctly held that the publicity material images for *Gone with the Wind* are no more than "pictures of the actors in costume." Indeed, if the publicity

-21-

material images from *Gone with the Wind* were sufficient to inject all visual depictions of the characters Scarlett O'Hara and Rhett Butler into the public domain, then almost *any* image of Vivian Leigh or Clark Gable would be sufficient to do so as well. Therefore, the only images in the public domain are the precise images in the publicity materials for *Gone with the Wind*.

The characters in *The Wizard of Oz* lie closer to the cartoon-character end of the spectrum. There are many stylized aspects to the visual appearances of Scarecrow, Tin Man, and Cowardly Lion, and they perhaps might be considered as live-action representations of cartoon characters. Dorothy, while not so thoroughly stylized, wears a somewhat distinctive costume and hairstyle. However, a close examination of the record reveals that these potentially distinctive visual features do not appear in a consistent fashion throughout the publicity materials. For example, in the publicity materials, Judy Garland as Dorothy sometimes wears a red dress and bow and black slippers, rather than the distinctive blue dress and bow and ruby slippers of the film, and her hairstyle also varies. From image to image, Scarecrow's costume color ranges from yellow to blue to black, Cowardly Lion's from light yellow to very dark brown, and Tin Man's from shiny silver to a dull blue-gray.[9] Moreover, there are publicity material images in which other stylized elements of the characters' costumes and faces are significantly different from the look used in the film. For example, in some images Tin Man's face appears metallic, and in others it appears flesh-colored. If the publicity material images for *The Wizard of Oz* were held to establish the visual elements of copyrightable characters, their scope would encompass almost any character who wears a scarecrow or lion costume, and a wide range of little girl and silver robotic costumes as well, creating an unacceptable result:

---

[9]The record shows that these extreme color variations resulted from the practice of using artists to hand-color still photographs originally taken in black-and-white (because color photography was relatively new and expensive). The coloration artists often were left to their own discretion in choosing colors for each photograph.

-22-

> If a drunken old bum were a copyrightable character, so would be a
> drunken suburban housewife, a gesticulating Frenchman, a fire-breathing
> dragon, a talking cat, a Prussian officer who wears a monocle and clicks
> his heels, a masked magician, *Rice v. Fox Broadcasting Co.*, 330 F.3d
> 1170, 1175-76 (9th Cir. 2003), and, in Learned Hand's memorable
> paraphrase of *Twelfth Night*, "a riotous knight who kept wassail to the
> discomfort of the household, or a vain and foppish steward who became
> amorous of his mistress." *Nichols v. Universal Pictures Corp.*, 45 F.2d
> 119, 121 (2d Cir. 1930).  It would be difficult to write successful works
> of fiction without negotiating for dozens or hundreds of copyright
> licenses, even though such stereotyped characters are the products not of
> the creative imagination but of simple observation of the human comedy.

*Gaiman*,  360 F.3d at 660.  While the overly broad characters would be in the public domain rather than copyrighted in the instant case, the analysis of the copyrightability of a character must be the same in either case.  *See Silverman*, 870 F.2d at 50.

We conclude that the characters' visual appearances in the publicity materials for *The Wizard of Oz* do not present the requisite consistency to establish any "copyrightable elements" of the film characters' visual appearances.  Therefore, once again, the only images in the public domain are the precise images in the publicity materials for *The Wizard of Oz*.

### 3. *AVELA's Use of the Public Domain Images*

We held above that no visual aspects of the film characters in *Gone with the Wind* and *The Wizard of Oz* are in the public domain, apart from the images in the publicity materials themselves.   Therefore, any visual representation that is recognizable as a copyrightable character from one of these films, other than a faithful copy of a public domain image, has copied "original elements" from the corresponding film.  *See Taylor*, 403 F.3d at 962-63.  We must examine the AVELA products based on *The Wizard of Oz* and *Gone with the Wind* to determine which ones

-23-

display "increments of expression," *Silverman*, 870 F.2d at 50, of the film characters beyond the "pictures of the actors in costume" in the publicity materials.  The AVELA products in the record can be analyzed in three categories.

The first category comprises AVELA products that each reproduce one image from an item of publicity material as an identical two-dimensional image.  While Warner Bros. does not challenge the reproduction of movie "posters as posters (or lobby cards as lobby cards)," it does challenge the reproduction of a single image drawn from a movie poster or lobby card on T-shirts, lunch boxes, music box lids, or playing cards, for example.  We read the district court's permanent injunction to follow Warner Bros.'s distinction, forbidding all uses except the reproduction of items of publicity material "in their entirety."  However, no reasonable jury could find that merely printing a public domain image on a new type of surface (such as a T-shirt or playing card), instead of the original surface (movie poster paper or lobby card paper), adds an increment of expression of the film character to the image.[10]  Similarly, Warner Bros. presents no reasoned argument as to why the reproduction of one smaller contiguous portion of an image from an item of publicity material, rather than the entirety of the image from that item, would add an increment of expression of the film character.  As a result, products that reproduce in two dimensions any one portion of an image from any one item of publicity material, without more, do not infringe Warner Bros.'s copyright.  For products in this category, we reverse the grant of summary judgment to Warner Bros. with respect to *The Wizard of Oz* and *Gone with the Wind* and direct the entry of summary judgment for AVELA.  We also vacate the permanent injunction to the extent it applies to products in this category.

_____

[10]This principle would not apply if the new surface itself is independently evocative of the film character.  For example, reproducing a publicity image of Judy Garland as Dorothy on a ruby slipper might well infringe the film copyright for *The Wizard of Oz*.

-24-

The second category comprises AVELA products that each juxtapose an image extracted from an item of publicity material with another image extracted from elsewhere in the publicity materials, or with a printed phrase from the book underlying the subject film, to create a new composite work.  Even if we assume that each composite work is composed entirely of faithful extracts from public domain materials, the new arrangement of the extracts in the composite work is a new increment of expression that evokes the film character in a way the individual items of public domain material did not.  For example, the printed phrase "There is no place like home" from the book *The Wizard of Oz* and a publicity material image of Judy Garland as Dorothy, viewed side by side in uncombined form, are still two separate works, one literary and one a picture of an actor in costume.  In contrast, a T-shirt printed with the phrase "There's no place like home" along with the same image of Judy Garland as Dorothy is a new single work that evokes the film character of Dorothy much more strongly than the two separate works.[11]  Because "the increments of expression added [to the public domain materials] by the films are protectable," one making a new work from public domain materials infringes "if he copies these protectable increments."  *Silverman*, 870 F.2d at 50.  Like the juxtaposition of an image and a phrase, a composite work combining two or more separate public-domain images (such as Judy Garland as Dorothy combined with an image of the Emerald City) also adds a new increment of expression of the film character that was not present in the separate images.  Accordingly, products combining extracts from the public domain materials in a new arrangement infringe the copyright in the corresponding film.  We affirm the district court's grant of summary judgment to

---

[11]Many of the phrases drawn from the underlying books are modified to some degree in the corresponding films, such as contracting "There is" to "There's" in the cited example.  The parties dispute whether such modified phrases are original to the films, and thus within the scope of the film copyrights, or still recognizable as phrases drawn from the books, and thus outside the scope of the film copyrights.  We need not resolve that question because we hold that, even if the phrases taken alone are outside the scope of the film copyrights, the juxtaposition of the phrases with images from the publicity materials is an infringement of the film copyrights.

Warner Bros. with respect to *The Wizard of Oz* and *Gone with the Wind* and the permanent injunction for this category of products.[12]

The third category comprises AVELA products that each extend an image extracted from an item of publicity material into three dimensions (such as statuettes inside water globes, figurines, action figures, and busts). Many of these products also include a juxtaposition of multiple extracts from the public domain materials, and such composite works infringe for the reasons explained in the preceding paragraph. Even where the product extends a single two-dimensional public domain image into three dimensions, a three-dimensional rendering must add new visual details regarding depth to the underlying two-dimensional image. (As a simple illustration, it is impossible to determine the length of someone's nose from a picture if they are looking directly at the camera.) Of course, even more visual details must be added if the two-dimensional image is transformed into a fully realized figure, as most three-dimensional AVELA products are. (Otherwise, for example, the back of each figurine character would be blank.) Much of this visual information is available in the feature-length films, where the characters are observable from a multitude of viewing angles.

In depositions, the AVELA licensees who developed the action figures, figurines, water globes, and busts made no pretense that they were not guided by their knowledge of the films. Instead, they indicated that, while each three-dimensional design began with an image from the public domain photo stills and movie posters, the goal was to create a product recognizable as the film character. The only reasonable inference is that the details added to establish perspective and full realization were chosen to be consistent with the film characters. As a result, the addition of visual details to each two-dimensional public domain image to create the

---

[12]AVELA does not dispute that a permanent injunction is appropriate to the extent that the AVELA products are found to infringe Warner Bros.'s copyrights.

-26-

three-dimensional product makes impermissible use of the "further delineation of the characters contained in" the feature-length films. *See Silverman*, 870 F.2d at 50. Accordingly, we also affirm the district court's grant of summary judgment to Warner Bros. with respect to *The Wizard of Oz* and *Gone with the Wind* and the permanent injunction for this category of products.

We also held above that the characters of Tom and Jerry are not in the public domain. In addition, because the characters achieved copyright protection through the short films before all but the first movie poster entered the public domain, and the later movie posters necessarily exhibit those characters, even the use of any movie poster but the first requires Warner Bros.'s authorization. *See Russell*, 612 F.2d at 1128 ("Therefore, since exhibition of the film 'Pygmalion' necessarily involves exhibition of parts of Shaw's play, which is still copyrighted, plaintiffs here may prevent defendants from renting the film for exhibition without their authorization."). Warner Bros. has granted such authorization to the extent it has averred that it will not challenge the reproduction of movie "posters as posters (or lobby cards as lobby cards)."

Therefore, AVELA may use the first Tom & Jerry poster, for the short film *Puss Gets the Boot*, in the fashion described above for the publicity materials for *Gone with the Wind* and *The Wizard of Oz*. Accordingly, with respect to Tom & Jerry products based on the first publicity poster, we modify the district court's grant of summary judgment and the permanent injunction to be consistent with the three categories of products described above for *Gone with the Wind* and *The Wizard of Oz*. With respect to all later Tom & Jerry posters, AVELA is authorized to make faithful reproductions, but not to reproduce those movie poster images on other products or to make derivative works based on Tom and Jerry. Accordingly, we affirm the grant of summary judgment to Warner Bros. and the permanent injunction crafted by the district court with respect to all other Tom & Jerry products.

-27-

## III.   CONCLUSION

For the foregoing reasons, we affirm in large part the district court's grant of summary judgment to Warner Bros. on the issue of copyright infringement and the resulting permanent injunction.  We reverse with respect to one category of AVELA products, and we vacate in corresponding part the permanent injunction entered by the district court.  We remand for modification of the permanent injunction and further proceedings consistent with this opinion.

_____

-28-